Southern Power v. Cleveland County and Mr. Smith, whenever you're ready, we'd be pleased to hear from you. Thank you, Your Honors. May it please the Court, my name is Chris Smith, and I have the privilege of representing Southern Power. This, Your Honors, is a simple case, and I'm going to focus my remarks on one essential point, the effective date. Southern wins because the effective date of this agreement, which is an essential term of this agreement, and I'll explain why particularly in this context it's essential, is July 24, 2007, and subsequently inactive laws do not apply here. But before going into that essential point about the essential effective date, I'd just like to make some table-setting comments, if I may. Southern Power is a good citizen. It values its relationship with Cleveland County. It values its relationship with all governments where it operates. It does not want to be here, frankly, and I think that comes through in our papers, that we have done everything possible to avoid being before Your Honors here today. But we had to be here. We must honor what the commitments made to our owners. Everyone knows, everyone in this courtroom involved with this case knows that Southern did exactly what it promised it would do, period, full stop. As we noted in paragraph 71 of our complaint, all that has changed since Southern did exactly what it promised it would do, is that there has been a change in the county commission and there has been a change in the county manager. We respectfully suggest that that... There has been a change in the law, too. A subsequently enacted change in the law, yes, post-dating the effective date of the parties' agreement, and it is... Can I, can I, I don't understand, well, I want you to explain to me why the effective date is the relevant date for your argument. I mean, is it your position that parties can enter into a contract and then backdate it to avoid new laws? I mean, could you and the county today enter into a similar contract, knowing it was inconsistent with subsection H, but just backdate it to July 2007 to avoid the application of subsection H? No, that's not... Well, why not, if the effective date is what governs? Well, that's, I think that if you have a government entering into a contract that is disabled by law, you can't, through, freedom of contract does not take you that far, that you could contravene a public policy which a statute reflects. Isn't that what you're saying you did? No, Your Honor. And if I may explain why that's the case, we don't need to go to subsection H, although we do win if we go to subsection H. But let me just focus, if I may, on the simple issue of the parties agreed to July 24, 2007. Couldn't it be said that one of the threshold issues here is whether there was a contract in the first place, and it's termed an agreement, and I wonder whether it's a contract or whether it was just an agreement to agree. Then you put it, sometimes you say it's a unilateral contract. I have a question about that because I thought the basic nature of contract was bilateral and that there was a meeting of the minds. But one of the things that concerns me, I think you have a pretty good equitable case, Mr. Smith, but I'm not certain that you have as strong a legal case as you might have made. And what concerns me is that in this initial agreement, I wonder if you protected yourself adequately because you didn't make any commitments. You didn't say that you were obligated to construct the power plant. You weren't required to invest any funds in the site, and the construction decision was left to your sole discretion. Yes, sir. But what I'm saying is so many terms here were simply left for you to fill in the blanks and according to the way you wish to do so. And so what I'm wondering here is whether we really have an initial contract. I'm sympathetic to the equitable argument you're making, but as far as the law of contracts, I need you to help me out. Yes. And if I may, Your Honor, focus directly on that point and push back on any concern that there is, in fact, a valid contract here. There's a lot going on here. And yes, I do think the magistrate below was misled by the invocation of unilateral. Yes, there's a unilateral concept here. But what we have is an agreement where the parties agreed on the effective date. I'll tell you why that's critical, why it's called essential in just a moment. But there's also a fair amount of action in this contract by a lot of. Yes, Your Honor. If you could clarify for me, when do you think there was a contract? When was the contract entered into? The contract was entered into effective July 24. Not when it was effective. At what moment did there become a contract? July 24, 2007. And the county became obligated to pay us our incentives once we reached commercial operations date under the incentives agreement. And if I may, Your Honor, just walk through the court. Before you start to walk through, do we agree there are three elements in a contract? Offer, acceptance, and consideration? Yes, Your Honor. What was the consideration? Well, the consideration is the relationship that is embraced in the incentives agreement. And we clearly have two parties together making mutual promises to each other. There are bilateral components from the get-go, from day one. I would direct the court to paragraph 14. The problem is, when this is a contract, it seems to me that there are just so many terms, vital terms to be filled in. And if there are that many vital terms to be filled in, I have a question whether there's a meeting of the minds or whether we have an agreement possibly to agree. But isn't it vital the day that construction was going to start or when it was going to be completed or what investments or funds were going to be made in the site? What threshold amount was going to be required before Southern could receive payments? In other words, this kind of contract in the business world is normally very detailed. Yes, Your Honor. And the parties negotiate these fine points. And it's just not left as loose as this. I understand your point about the fact that you went ahead and you thought you were going to get started construction. You started paying taxes at a certain point. You thought you were going to get these payments. But the question is, did you do enough to protect your position at the outset? Yes, Your Honor. As a sophisticated business entity, there's some obligation of self-protection. And I just don't know whether you've done that. So help me out. Yes, Your Honor. And here is how that works. And this is how these agreements work when you're partnering, partnering with a government. The essential piece to be done here and the only really remaining big piece was the construction of at least a 50-megawatt power facility. Fifty megawatts is mighty big. It's a mighty big expenditure. We built a 720-megawatt facility pumping more than $300 million into the ground in Cleveland County. This is not a spec project. This is not if you build it, they will come. In the county, I encourage the court to look carefully at the complaint and the record where the county acknowledges this, that Southern can only do this if it is able to secure the agreements for people to buy the power. We don't come in, spend $300 million, take five years doing it, and then say we're open for business. I don't think anybody is suggesting that. Remember, we started with where the effective date is. Okay. Two weeks after that effective date, you can walk away from the contract. There is nothing that prevents you from doing that. There's no liability to you, right? Well, I think at that point, both parties would have a claim for reliance, taking actions on the agreement. There are bilateral promises, things that the county is undertaking. There would – I mean, there's activity from the effective date all the way until when the – Maybe activity, but is there activity that you have contracted that you will not take that can be enforced by this agreement? And I would suggest that there just isn't. There is detrimental reliance, but, yes, it is a clear – Only if this is a contract can you claim detrimental reliance. It's an agreement that does not have contractual force. Well, Your Honor, the parties walked into this knowing that it can only happen if Southern is able to secure the power arrangements and contracts with customers, which it did not have. Can I ask you just a follow-up question? Because I really do want to understand your argument. Just following up on Judge Motz's question, just assume hypothetically that as I read the contract, there would have been nothing to stop your client from walking away in two weeks after signing this agreement and just saying it doesn't say we're going to build a plant and now we're not going to build a plant. If I think that is the only reasonable reading of this agreement, how does that affect your argument? Do you have a fallback argument other than actually we were required to build this plant starting on the effective date? It can work exactly that way, Your Honor. And, in fact, two weeks after July 24th, Southern could have said, you know what, we tested the market. There is no way we're going to be able to get the power contracts to justify putting $300 million into the ground. The parties knew this when they shook hands, and they knew and they wanted Southern to go get those agreements. Southern was able to secure the agreements such that it knew the economics of the investment would work. Your Honors, I would, and I do want to reserve time for rebuttal, but I would suggest to the Court that this is a basic capital infrastructure investment agreement done widely. Another agreement that had the same situation as this one is that we had this statute acted shortly after the contract, making the contract illegal. I'm aware of no such case, Your Honor. I don't have another incentives agreement in the record. It doesn't have to be any kind of agreement that has the same kind of provisions in it that do not have an immediate obligation on either party's part. Yes. And you don't have one, right? Who drew this contract or this agreement? Well, it was negotiated by both parties. The law firm was the Sanford Holzhauser Law Firm for Southern at the time. It's on the agreement, but it was negotiated by the county's attorneys. If I may, Your Honors. It was Southern's law firm that wrote it, right? Well, they're on the front page. There is not in the record who cranked out the first. That would be my assumption. That's why I'm asking you. You're Southern's lawyer, so you know through the contract, right? Respectfully, I was not involved in the negotiations. I do understand that, but this is your client. When you go into your client, you don't say, don't tell me anything about what happened, so you know who drew the contract. Yes, it's not in the record, and frankly, I didn't ask the client, but my assumption is it says prepared by Sanford Holzhauser. But it was negotiated. Who's Southern's lawyer? Yes, Your Honor. That's the part I didn't know. Yes. But it's a negotiated agreement, and Your Honors, what I would suggest to the court that is a very important concept here is that capital infrastructure agreements, this is how they're done. The county's position is essentially, as of now, everybody was very happy before. We have a subsequently passed ordinance after subsection H saying, yes, there is a contract. The county said that. There is a freedom of contract. That's this court's seven peanuts case that recognizes the ability of the parties to agree to what will work for them, what would work for them here, and what everyone shook hands on firmly. What everyone agreed to was, Southern, we love you. We want you here. We understand we can't get you here unless you can secure the power contracts. See if you can do it, and we know if you can't, you can walk because they're not going to make that investment unless they can get it, and that's what everyone agrees to. That's contract. If Southern does this, we are on the hook, and we can't walk. Is that what you're saying? That seems like a very odd contract for the county to enter into, but what I would like, and this is my time, so don't worry about going into your rebuttal. Thank you, Your Honor. Because this is an important case that we want to get right. It involves a lot of money for your client, for the county. Can you tell me what actions in reliance on this contract you took between July 24, 2007, and the day when Section H was passed, which is what, a month later? It is not in the record for me to be able to say specific acts. Were there any specific acts? I can't represent to this court specific acts, but, Your Honor, it flows from the record and its inferences in Southern's favor that they talked a long time about this agreement. The county knows that Southern needs to negotiate the agreements, do preliminary work. A 720-megawatt plant takes years. Once they struck a deal, July 24, it was off to the races, and they were able to secure all the agreements needed in order to make it economic and come back to the county and say we're ready to go. Before Section H was enacted? We did not, no. All the agreements were not secured. Was anything done before Section H? If you point to anything, you're telling me they worked hard on it. Yes. Your Honor, that is my representation to the court, that all that period of time would involve the work needed in order for Southern to be in position to say, yes, county, we can do this, we can make this work. And, Your Honor, to answer your question directly. At what time did you actually fulfill the requirements set forth by subsection H? I mean, where you promised or whatever or either performed to maintain the specific level of job creation and the capital investment over time that subsection H requires. At what time did you, do you contend you were in compliance with subsection H? Well, again, I know the court appreciates that we don't need to comply with subsection H. But those provisions in, that's our initial position, Your Honor. But we went under subsection H because the provisions under subsection H, you know, talking about the amount of investment, the number of employees, those are not mandatory provisions. And I would direct the court to our briefing on that. They're not mandatory provisions. They're guidance. You could never have a purely capital infrastructure agreement under the counties after the game construction of subsection H. You could not have Google come to North Carolina and build a server farm, which takes, you know, a handful of employees. It wouldn't work. And, Your Honor, Judge Motz, I want to answer your question directly about, well, could the county then walk away? The walkaway provisions in the agreement are what they are, and they only run towards Southern. I will represent to the court that certainly if the county wanted to call it off, Southern doesn't want to be anywhere, that it's not wanted. And they would have worked that out. Sure, for a small fee, yeah. So in response to Judge Wilkinson's question, he gave you the benefit of the doubt, I guess, in suggesting that at some point what you are doing here is in compliance with or this agreement is in compliance with section H. But section H provides that each agreement shall contain provisions regarding remedies for a breach of those responsibilities on the part of the private enterprise. But here the agreement provides only for remedies available to Southern power. Yes, Your Honor. And what I would suggest to the court— Not to the county. So how can it possibly comply with section H? Your Honor, my best response to the court on that point is that this clawback concern, recapture concern, there is historically, if Your Honors read the Moretti case, there is great flexibility to allow partners to come up with a capital investment like this. But what I would suggest to Your Honor is that this provision is there to prevent the county and governments from being abused by their private partners. Uh-huh. We have done everything right. It is not meant to be weaponized against those who have done everything right. But you say no, it is not in the agreement, but we act honorably and so there is no need for this to be in our agreement. Is that what you are saying to me? No, Your Honor. Your Honor, what I am saying is that there is—so to be perfectly clear about this, there is no recapture issue, period, full stop, because the county has no financial obligation to Southern power until we sink $300 million in the ground and turn the lights on a fully operational 720 megawatt plant. But the county has no risk whatsoever, full stop. So that is why I say it is entirely improper for the county now to try and essentially weaponize a subsequently enacted statute that is meant to protect— Excuse me, but we keep skipping over this point. You come back to it. You can come back to it in rebuttal. But we are talking about a waiver of sovereign immunity here. And in order for the county to waive—for you to successfully pursue a waiver of sovereign immunity, there has to be a contract. And, you know, that really lies at the heart of all of this because there is no waiver of sovereign immunity if there is no contract. Now, I would like you to address that on rebuttal. You tried. Yes, sir. And we've given you a lot of extra time. If either one of my colleagues has a further question of you, it's okay. Judge Mott, do you have any further questions at this point? No, I've done a lot of talking, but I think Judge Harris might have some. No, I'm good. All right. Okay, thank you. Thank you. Good morning, Your Honors. May it please the Court. My name is Grant Osborne. It is my privilege to represent Cleveland County in North Carolina at the FLE. The company has said that this appeal is about restoring trust and good government. We agree. Trust and good government require this court to enforce clear statutory law that's designed to protect taxpayers from expenditures of tax dollars that don't comply with protections mandated by law. We're talking about a law that was in place long before the contracting issue came into being. This deal does not provide those protections. They're clearly spelled out in subsection H. The alleged contract, which did not arise until 2012, given the nature of this alleged contract, clearly violates subsection H. The settled law of North Carolina provides that the county cannot lawfully comply with a contract that from its inception has been illegal and void. Can you talk to me about the effective date argument that your colleague on the other side is making? What does that mean? It does say effective date, July 24, 2007. I don't think that anyone disagrees that that was the day that the agreement was signed, and the parties clearly thought they were entering into something, and that the applicable law was the law as of July 24, 2007. Yes, Your Honor. This argument about the effective date is really an argument about waiver of illegality. Waiver of? Of illegality of the contract. The idea that parties to a contract could pretend that a contract existed before it existed is simply a way of saying we would like to exempt ourselves from the settled doctrine that the law that exists on the date on which a contract is made is the law that applies to a contract. That's fundamental contract law in North Carolina and no doubt elsewhere. But part of what I think they're claiming is that this is a unilateral contract and that North Carolina recognizes the law of unilateral contracts. Yes, sir. All right. And what was tendered here was on this agreement in early July, that it wasn't a full-blown contract, it was an offer, and that the offer was accepted upon performance. And at that point in time, it became a bilateral contract when the early July offer was accepted through performance, the performance being the construction and the payment of taxes and the rest. Now, that's their argument. Even if we didn't have a contract in early July, this agreement or whatever you call it is an offer. It's a unilateral contract. It became a full-blown contract when the county took the huge steps that it did to perform. What's your response to that? My response, Your Honor, is there are three things the court must keep in mind. An offer was made, a unilateral written offer was made by the county on July 24, 2007. That's the document to which opposing counsel has been referring. It's just an offer. If you look in the document for any commitment by Southern Power, you will look in vain. A moment ago, counsel referred to promises that Southern Power paid. The company has never made any promise to the county ever, certainly not in the alleged contract. That's why that document is nothing more than an offer. If you look at it, you'll find language that says, as I think Judge Wilkinson mentioned, that all construction investment is entirely in the discretion of the company. The next date is 37 days later, August 30, 2007. The Local Development Act was amended by Subsection H. That clearly imposes very strict mandatory requirements, using the word shall three times, regarding these economic development contracts. Are you saying by that that because of Subsection H, that Southern never performed? I'm saying, Your Honor, that Southern has never- Did it never perform in a manner that would constitute an acceptance because it didn't have the promises of capital investments or employment? Not exactly, Your Honor. What we're saying is that for the sake of this Rule 12 motion, we're conceding that Southern Power did what it says it did in the complaint, of course, but that performance does not comply with the law that had been in effect for more than five years before the commercial operations date, the payment-triggering event, according to the complaint, that took effect in August of 2007. Did they ever comply with Subsection H at any point in time? No, Your Honor, not at all, because Subsection H clearly mandates at least three mandatory provisions, none of which appears in the only document of this alleged contract, which, again, is nothing more than the county's unilateral offer. That's the problem with the company's argument. You were about to give us three dates. I'm sorry, I'm a little bit confused. So there's the date of the agreement, there's the date of Subsection H, and then I assumed the next date you were going to give us is 2012. Yes, Your Honor. And in 2012, is this what happens? Southern, the power company, performs, so now there is an agreement, but the agreement is invalid because of Subsection H? That's exactly right, with one qualification, Your Honor. The only qualification is that, to make sure that we're precise in a terminological sense, there was no agreement in July of 2007. There was an offer. I'm sorry, the offer, right. There's this document in 2007. It becomes a contract in 2012, but because of the intervention of Subsection H that it's not a valid legal contract. That's your position? That's exactly right, Your Honor, because, as Judge Wilkinson said, our law does recognize the possibility of a unilateral contract, which is a fundamental contract notion. A party can make an offer. The offer is not binding on anybody until the offer has been accepted. Obviously, to the Court's point, every contract requires offer, acceptance, consideration. The offer occurred on July 24, 2007. Acceptance and consideration occur in the same event in the context of a unilateral contract, in the form of performance in accordance with the offer. That performance is acceptance and consideration. The plaintiff's problem is that that kind of performance did not result in a valid contract by the time it came about because more than five years before, the legislature had adopted a statute. Let me tell you my concern. I understand your argument, and I understand why the timing in this case left the power company with lots of notice because Subsection H was passed shortly after the offer. But what if Subsection H had been enacted in 2012, the day before they're about to cut the ribbon on their power plan and start providing power? Then they'd really be up a tree, right? Well, under the doctrine of unilateral contract law, performance must take the form contemplated by the offer. And if, by the time performance has been rendered, the contract contemplated by the offer is unlawful, then I think that Southern Power would still have the same problem it does. The same result. They would have the same result. Fortunately, for our argument, frankly, that is not the case. The law in question took effect 37 days after the offer was made. It took effect more than two years before the plaintiff claims to have turned a shovel of dirt on this plant. But there'd be no protection in my hypothesis. Excuse me, Judge Harris. That's okay. Go ahead. How do we know that they never performed? Is it undisputed at this stage that they never provided the investment or they never invested the funds, or that they never provided the employment or jobs? Or how do we know that they didn't comply with subsection H when that power plant went up? I've heard two different questions, Your Honor. The first goes to whether the company performed.  Of course, the court must assume that the company performed as it pleads in the complaint. We're not taking issue with whether Southern Power did what the complaint says it did. The issue is the legal effect of what it claims to have done. To your second question, Your Honor, the issue is what does subsection H require? Again, the only document in question here is the offer made by the county, drafted, as we heard, by Southern Power's counsel. That document is accompanied by nothing else that describes the terms and conditions of the deal. Subsection H explicitly says, in effect, thou shalt include three different things, which I could go over, but the court has them in the record. It says this is what such a contract must include. The contract, again, is a function of offer, and then more than five years later, acceptance and consideration in the form of performance includes none of them. There is no, in my opinion, no plausible argument that the contract does include any of them. Why do you say that they didn't comply with subsection H when the plan was up and running? Certainly, Your Honor. They obviously would have had to employ some people by that time, and they obviously would have had to invest funds by that time. So why are you saying that there was no performance of such a nature that would comply with subsection H? Your Honor, we're not suggesting or saying that there was, quote, no performance. I'm not implying that no performance is critical to our argument. What we are saying is that the company, and for that matter, the parties have not complied with the dictates of subsection H implemented by law. Why? Why have they not complied? Because such a contract, certainly. I think it would help if you looked at subsection H. Yes. That's what is missing in the discussion here. It requires certain recapture items that just aren't in this agreement. That's correct, Your Honor. The language of the statute says that each economic development agreement shall clearly state the parties' respective responsibilities. The offer, in this case, states no responsibilities of the plaintiff. Does it state conditions of entitlement to payment? Yes. But does it state responsibilities? That is something the company must do. No. Next, subsection H says that each agreement shall contain provisions regarding remedies for a breach of those responsibilities by the private enterprise. Does the offer document, again, the only document in question here, does that document include any such provisions? No. The word breach never appears. The word remedy never appears. The word remedies appears once with respect to the rights and remedies of the plaintiff, not the county. Finally, Your Honor, subsection H says that the provisions regarding remedies for breach shall include a provision requiring the recapture of sums appropriated or expended by the county. The offer document includes no such terms. The offer and the resulting contract based on it thus don't comply with the statute because the deal includes none of the mandated terms. Can I just have a question about subsection H? So is basically the gist or at least the effect of subsection H is you just can't have these unilateral agreements anymore because they don't have specified rights that can be breached? Well, if you're asking whether parties can enter into unilateral economic development contracts in accordance with the Local Development Act, we haven't argued about that, Your Honor. I think given the way the statute is written, that it says that such contracts shall state and shall include, that begs the question of whether a unilateral contract in this context could exist. I'm sorry. I don't know what you mean by begs the question. Does it say? The statute does not answer the question explicitly, Your Honor. Well, how could you have a unilateral contract consistent with subsection H? I don't believe that you could, frankly. Okay. I don't think there's any way that could occur. Okay. Because the language says shall state the parties' respective responsibilities. I think that concept and the concept of a unilateral agreement seem to be mutually exclusive. Is there some reason to think, like, why did the legislature think that this kind of a contract, which does seem to offer very good financial protection to the county, should be prohibited? Do you know why they? No, Your Honor. I don't know what was in the minds of the legislators when they adopted it, but we know this. If you look at subsection H, the legislature was crystal clear about what such agreements must include for the purpose of protecting the taxpayers, of course. Can you explain to me what happened on January 6, 2009, when the county publicly reaffirmed Southern Power's proposed plant and stated it falls under the terms of the agreement and contractually the county is committed to the incentive grant set forth in the agreement? I'm sorry, Your Honor. You're asking what happened on that date? No, I'm asking what the effect of it is. The effect of it is null and void, Your Honor. There is no effect. The simple reason that parties to contracts are not allowed to create, essentially to pretend a contract existed when it doesn't exist, and our law is very clear that everyone is presumed to know the law. Like a declaration against interest? Remember that from law school? Yes, Your Honor. I do. It seems to me that the county is saying it publicly reaffirms this, and it says that the proposed plant falls under the terms of the agreement that we've been talking about, and contractually the county is committed to the incentive grant set forth in the agreement. Yes, Your Honor. I can certainly see that opposing counsel would like to make some hay out of that, of course. But the law steps in and says no matter what a party to a contract says, especially in the context of an economic development deal with a governmental agency, that everyone is presumed to know the law, and our Court of Appeals said in 2001 in the Data General case, that parties dealing with governmental organizations are charged with notice of all limitations upon the organization's authority, as the scope of such authority is a matter of public record. I understand what you're saying about this, but this is not the other party trying to, it's the county itself, it's the governmental agency. So I haven't found a case like that that has this wrinkle in it. Have you? No, Your Honor. We have not either. But to answer your question as to whether that declaration by one party to the contract, the county in this case. It's the party that is going to be harmed by the fact that this is, in fact, a binding contract. If that party says this. Yes, the party who's allegedly made the promise to pay, right? Right. In this context, let's assume that that, as we must for the sake of discussion, let's assume the county said exactly that. What is the legal consequence of that? The consequence is nil. Why? Because the legislature, years before, said, this is what such a contract must include. And the company, the plaintiff was on notice of that and cannot claim, frankly, with a straight face, to have been fooled or misled by Cleveland County. The law was crystal clear, and everybody knows that when dealing with a government agency, you've got to know what the law is and comply with the law. But, counsel, I mean, you have to, I hear what you're saying, but, I mean, as the magistrate judge suggested, this case does look pretty unfair, and it does look as though the county was not playing straight. I mean, there are plausible allegations here, right, that this power company went to great lengths, invested a huge amount of money in reliance on the capital A agreement, the original promise that if it did, then the county would make these incentive payments. And then it comes back to the county in 2009 just to make sure we're all good here, right? And that county is like, 100%, we're all good. And then at the last minute, they say, no, no, no, we're not good. Subsection H precludes this, so we're going to keep the plant, and you don't get the incentive payments. So do you have, like, a response to just how bad this looks? Yes, Your Honor, we do. Essentially, that's the fairness argument. That's a card that the plaintiff's been playing for some time in the briefing, and I think you're right, that this is somehow unfair to the company, as I think Your Honor might be suggesting. There are two reasons why that is not true. Number one, factual. Number two, legal. This whole fairness idea is that they play by the rules and we haven't. That's the gist of the fairness argument. The plaintiff has not been blindsided here. They cannot say that. This is a company that has millions of customers and spent millions of dollars. They cannot claim to have been blindsided by changing the law 37 days after the offer was made. Likewise, this law, Subsection H, became the law more than two years before the plaintiff claims that it broke ground. That's all in the pleadings. To your point, Judge Mott, the company does not even claim that it did anything in reliance on the law in that brief window between the date of the offer, July 24, and August 30, 2007. It doesn't do what? So it's hard. That argument cannot be made possible. I asked your colleague a few minutes ago, and he said that they were doing a lot of thinking and planning. Yes, we wouldn't know about that, but it's just not in the pleadings. Number four, the plaintiff does not claim to have engaged in detrimental reliance on the law. I'm sorry, I just said this, before it changed in August 2007. So that's the factual reason why this unfairness argument simply has no merit. The legal reason is what I said a moment ago. Parties are presumed to know the law, especially when dealing with governmental agencies, and the law has been very clear on that point. It was incumbent upon the company, frankly, no matter what representations it got from the county, to make sure that the alleged contract complied with the law, and they apparently failed to do that. This seems somewhat, I can't think of exactly the right word, but just to have the county's lawyer up here saying, who would rely on what the county told them in 2009? That's crazy. Nobody does that. I mean, it just seems a little off, no? The county told them in 2009, no, we're fine, this is all good. And why can't somebody rely on the good word of the government when they make them a promise like that? Well, I suppose the short answer, Your Honor, is by simply looking with the lawyers and asking whether that reliance is legally binding and legally meaningful. That's really not the answer. I cannot say I was on the scene at the time. And to your question, Your Honor, may a party rely upon the representations of a local government when they say, sure, we're good, you use your term, when they know or are charged with notice that the law says, you want a deal like this and you want millions of dollars of taxpayer money? You better comply with the law. They apparently didn't do that, and there's nothing in the record suggesting they did. I just feel like you read this record that neither party knew about. That is my personal opinion, Your Honor. But that is not in the record. And our law is very clear. There is a case I would like to bring to the Court's attention. I assume my time is about up. The case of Kanzler v. Penland NC, the citation is 125 NC 578. This speaks very clearly to efforts to waive illegality, such as by an effective date agreement. Our law does not permit that. The law will not enforce an illegal contract, no matter what the parties may do to try to accomplish that result. All right, let me ask you this one final question here. You were saying, as I understand it, that compliance with the law here and performance, and particularly compliance with the law here, it can't just be derived from looking at acts, such as the construction. If the only way to comply with the law is through a series of written documents that clearly state for the parties' respective obligations, as outlined and detailed in Section H. That's exactly right, Your Honor. That's what the statute says. In other words, the compliance and the performance is not just a shovel in the ground or an employment of someone or even investment in funds.  Stating the parties' respective obligations? That's what the statute says, Your Honor, and that's what the legislature decreed the law to be in August of 2007, more than two years before the company claims to have done anything in reliance on this offer by the county. But you don't say that as a general rule. You say that with respect to Section H, because Section H says that. We have to have these provisions in. Yes, Your Honor. It's not like in general you'd have to spell out everything that is the law in order to have it. That's correct, Your Honor. We're dealing with a case here in which the positive law prescribes the elements of a contract of this kind for an obvious public policy purpose to protect taxpayers from government agencies that might spend their money in some way that was not consistent with Subsection H. That's why that statute was enacted, obviously. I see that my time is up. If I may disclose a couple of points. No, your time is up. It's not up if either of the panel members has any further questions of you. Judge Motz, do you have further questions of Mr. Smith? I don't think so. Thank you. We would ask the court to affirm. Thank you very much. Did you have any questions, Judge Harris? No, I didn't. Thank you. All right. Thank you. Thank you very much, Mr. Osborne. Thank you, sir. Mr. Smith, let me ask you this. You've followed the course of the respective arguments here. And the panel's questions have indicated that some skepticism about whether this was ever any kind of contract to begin with, that would constitute a waiver of sovereign immunity. And there have also been some questions as to whether there was ever, at any time, compliance with Subsection H in the way that the statute in positive law says compliance must take place. Now, I think that all three of us have raised sort of serious questions on both fronts. And I think you need to address them. Yes, sir, Your Honor. Thank you. I'll begin with the contract issue, which was also, Your Honor, the question that you left me with during my opening. I think there are three components to why there is a contract here. First, as of the effective date. First, starting with the general principle of freedom of contract, as set forth in the Peanut case and throughout North Carolina Supreme Court law, that there are three components for the court to consider to recognize that there is a contract effective as of July 24, 2007. Number one, the effective date itself. And it's described as essential in the last whereas clause. The stability, the firmness of the agreement, the commitments are described as essential. The effective date runs through the agreement in sections 1B, 10A, 18, and 20. Counsel, I don't mean to throw you off, and I know you're starting with effective date, but you do agree, right? You don't dispute that if this party, I'm sorry, if this contract was formed in 2012, hypothetically, if that's when this contract was formed, as your colleague says, then it really wouldn't matter if the parties try to give it an effective date that precedes subsection H. You wouldn't be allowed to do that. You couldn't enter an agreement 2012. So the effective date by itself doesn't get you where you need to go. You also have to show that this contract was formed and entered into in 2007. Yes, but alternatively, Your Honor, and I will get back to the gating point that Judge Wilkinson asked me to address, but to fully respond to Your Honor's question, there is the relation back principle under North Carolina law, and we win on that. Frankly, Your Honor, it is irrelevant to Southern, and should be irrelevant to this court, what other states do with the relation back concept. Yes, it is a minority position, but we do it, and other states do it. It is not the majority position, and we win under it. And this is your argument that, well, the contract was entered into in roughly 2012, sort of bracketing that for a minute, but then when that happened, it sort of related back temporally so that now it was actually executed in 2007. To put a fine point on it, Your Honor, the commercial operations date was achieved in December of 2012. You know, those nice lucite cubes in the briefing, the pictures of them, and in the complaint. That's when everybody celebrated this. That's when there was performance, full performance, triggering the county's obligation to start paying the incentives. Okay, and can I ask you a question then about your relation back argument? Are there any cases saying that you can use the relation back fiction, which is much like the effective date fiction, to circumvent intervening statutory change? Because I would think that it would create some of the same problems, that you have two parties effectively contracting around a statute. Well, I appreciate that question very much and the importance of honoring public policy. And that's, you know, the phrasing of circumvent around, I don't think that's how I would view it. I don't have a case, but that case in this matter would have to come out and say, well, we're essentially, we're going to allow the county to weaponize subsection H, even though we have this relation back principle, just because there isn't technically, to your questions, Judge Motz, there isn't technically a recapture provision in this agreement, because there does not need to be one. There is no financial risk to the county. If we don't turn the lights on, they're not obligated, period, full stop. So, Your Honor, I would look at that question about case law speaking to the relation back concept in this circumstance as, well, public policy is how we would look. We would look through the lens of public policy at that kind of circumstance. I don't want to take up all your time. That seems sort of double edged to me, because surely the state of North Carolina has a pretty solid public policy interest in having its statutes enforced, and if private parties can contract around state statutes, that seems to raise its own set of public policy concerns. Well, we're not contracting around the contracts before, but to your point, Your Honor, the way I would look at the public policy lens here is subsection H is there to protect counties, rural counties, from being rooked. That's a separate argument. Whether you complied with, I guess for purposes of my hypothetical, assume it is a statute that has not been complied with, then it seems as though it would be problematic to allow two private parties to use a legal fiction like relation back or backdating an effective date to avoid application of a state statute. I think with this federal court looking at this, you would have to divine that the state of North Carolina would not, in this instance where there is full performance, that the law would say that the public policy here somehow ought not to be to honor agreements as opposed to protecting against a non-existent risk. That's the point of a, quote, clawback or a recapture. If you don't do what you're supposed to do, then you can be recaptured or clawback. To return to the gating... I'll follow up on what you just said. So if this case was before the Supreme Court of North Carolina, you would win. Is that what you're saying? I believe we would, Your Honor. Of course, you chose the forum, didn't you? We did. And that's a yes, Your Honor. We chose the forum. We chose the forum. We chose the processes and the independence of the federal courts, Your Honor. But don't we have an obligation in that posture? Don't we have an obligation as a federal court interpreting state law not to undercut the significant public policies of North Carolina? I don't think North Carolina has a certification procedure, so it's not something we can use. But the way I see it or what I'm thinking about is that we have an obligation we can't certify. We've got an important question of state law before us. And the whole purpose of subsection H is to maintain the integrity of local budgets and county budgets and not having localities taken advantage of by contractors who promise this and promise that and don't deliver and all the rest. And I know you say, well, this isn't that the public policy isn't implicated, but I'm not sure. And it seems to me a bit difficult to write an opinion ruling in your favor without doing some damage to the legitimate public policies of North Carolina, which don't favor casual remedies, casual waivers of sovereign immunity, unless there is a contract formed. And then we are told, oh, we'll use the relation back doctrine, a minority doctrine to do what I think is a danger. But, you know, as a federal court looking at North Carolina law, I think we have an obligation to protect its view of sovereign immunity waiver. And also, it's the public policies involved in subsection H. I just want to be clear with you that I, you know, that I'm still thinking this through. But these are reservations that I'm having. I'm still trying to puzzle it out because I think Judge Harris makes a very good point about there is an equitable argument here, but there's, you know, there's another argument on the other side. And that concerns North Carolina public policies of a very concrete sort. I agree, Your Honor, and I appreciate those comments. I will address the relation back point. And then I want to return to why there is a contract. We've given you extra time and we actually gave you more extra time than your opponent. So you be quick. Yes, sir, Your Honor. As to the relation back point, the way I would suggest to the court to look at that is we have the law to apply. We know what the law is with respect to any concerns about public policy. I would suggest to the court that the public policy concern is counties being mistreated when, in fact, it is southern here that profoundly has been mistreated. To come back to the contract issue, Your Honor, to show that you don't even need to get to relation back. In addition to I mentioned I had three points for the court to think about, about how the how this contract works and how the freedom of contract here works. Counsel, you're repeating yourself now. Your time has expired unless my colleagues have questions. All right. Judge Moss, do you have any further questions? I don't have any questions. Judge Harris? I don't. Thank you. Thank you, Your Honor. No further questions. Thank you. Thank you, Your Honor. Mr. Smith and Mr. Osborne, I would like to thank you both and say that it's disappointing that we can't come down and shake your hands. But I think we all know the reasons for that. And but that doesn't lessen our appreciation one bit for the fine arguments that I think each of you has made. I think you've each done a fine job representing your clients' respective positions. So thank you very much. Thank you, Your Honor. Thank you very much. We appreciate the court's attention.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Pamela A. Harris